**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| JAMES R. SCHMIERER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:18CV822 |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social | ) | |
| Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff, James R. Schmierer, brought this action pro se pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 14 (cited herein as "Tr. ___")), and both parties have moved for judgment (Docket Entries 16, 23; see also Docket Entry 24 (Defendant's Memorandum), Docket Entry 26 (Plaintiff's Reply)). For the reasons that follow, the Court should enter judgment for Defendant.

---

[1] The United States Senate confirmed Andrew M. Saul as the Commissioner of Social Security on June 4, 2019, and he took the oath of office on June 17, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Nancy A. Berryhill as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I. PROCEDURAL HISTORY

Plaintiff applied for DIB, alleging a disability onset date of April 1, 2011. (Tr. 238-39.) Upon denial of that application initially (Tr. 84-103, 126-29) and on reconsideration (Tr. 104-25, 134-41), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 142-43, 309). Plaintiff and his attorney attended the hearing (Tr. 40-82), after which the ALJ received the vocational expert's ("VE's") written responses to interrogatories from the ALJ and Plaintiff's counsel (Tr. 355-80). The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 16-32). The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-5, 15, 217-18), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings:

> 1.  [Plaintiff] last met the insured status requirements of the . . . Act on December 31, 2016.
>
> 2.  [Plaintiff] did not engage in substantial gainful activity during the period from his alleged onset date of April 1, 2011 through his date last insured of December 31, 2016.
>
> 3.  Through the date last insured, [Plaintiff] had the following severe impairments: osteoarthritis in the bilateral knees; lumbar degenerative disc disease; insomnia; post-traumatic stress disorder; and adjustment disorder with depression and anxiety.
>
> . . .

4.   Through the date last insured, [Plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5.   . . . [T]hrough the date last insured, [Plaintiff] had the residual functional capacity to perform light work . . . with the following limitations: he was incapable of climbing ladders, ropes, and scaffolds and was incapable of kneeling, crouching, and crawling, but he was otherwise capable of occasional postural activities; he was incapable of operating a motor vehicle for work; he was capable of occasionally operating foot controls bilaterally; he was to avoid all exposure to hazards, including unprotected heights and moving mechanical parts; he was incapable of traveling for work; he was capable of working in an environment with no more than a moderate noise level as defined by the Selected Characteristics of Occupations (SCO); he was able to understand, remember, and carry out simple instructions and perform work that had no strict time or high quota demands and was in a routine work setting that had only occasional changes in the work routine; he was capable of no more than occasional, brief, non-team interaction with co-workers and supervisors and occasional, brief interaction with the general public; and would have been off-task up to 10% of the workday due to an inability to maintain concentration.

. . .

6.   Through the date last insured, [Plaintiff] was unable to perform any past relevant work.

. . .

10. Through the date last insured, considering [Plaintiff's] age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that [Plaintiff] could have performed.

. . .

11.  [Plaintiff] was not under a disability, as defined
in the . . . Act, at any time from April 1, 2011, the
alleged onset date, through December 31, 2016, the date
last insured.

(Tr. 21-32 (internal parenthetical citations omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits."  Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006).  However, "the scope of . . . review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).  Plaintiff has not established entitlement to relief under the extremely limited review standard.

### A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).  Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard."  Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)).  "It consists of

more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Social Security Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Social Security Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work."

---

[2] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2
(4th Cir. 1999).[3]  A finding adverse to the claimant at any of
several points in the SEP forecloses an award and ends the inquiry.
For example, "[t]he first step determines whether the claimant is
engaged in 'substantial gainful activity.' If the claimant is
working, benefits are denied.  The second step determines if the
claimant is 'severely' disabled.  If not, benefits are denied."
Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at
each of the first three steps, "the claimant is disabled." Mastro,
270 F.3d at 177.  Alternatively, if a claimant clears steps one and
two, but falters at step three, i.e., "[i]f a claimant's impairment
is not sufficiently severe to equal or exceed a listed impairment,
the ALJ must assess the claimant's residual functional capacity
('RFC')." Id. at 179.[4]  Step four then requires the ALJ to assess

---

[3] "Through the fourth step, the burden of production and proof is on the
claimant.  If the claimant reaches step five, the burden shifts to the
[government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[4] "RFC is a measurement of the most a claimant can do despite [the
claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative
regulations require RFC to reflect claimant's "ability to do sustained work-
related physical and mental activities in a work setting on a regular and
continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an
equivalent work schedule" (internal emphasis and quotation marks omitted)).  The
RFC includes both a "physical exertional or strength limitation" that assesses
the claimant's "ability to do sedentary, light, medium, heavy, or very heavy
work," as well as "nonexertional limitations (mental, sensory, or skin
impairments)." Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only
after [the ALJ] considers all relevant evidence of a claimant's impairments and
any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

### B. Assignments of Error

Plaintiff argues that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "Plaintiff's conditions, including but not limited to [o]steoarthritis, [post-traumatic stress disorder ('PTSD')], [g]eneralized [a]nxiety [d]isorder [('GAD')], [u]nspecified [d]epressive [d]isorder and ongoing symptoms of chronic pain,

---

[5] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

agitation, depressed mood, sleep disturbance/nightmares, hypervigilance and flashbacks of traumatic events, all of which are supported by the medical evidence, have resulted in marked to extreme limitation that prohibits him from maintaining gainful activity" (Docket Entry 16 at 2 (internal citation omitted));

2) "[p]roper weight was not assigned to the evidence presented in this case" (id.); and

3) "[e]vidence presented does not substantiate conclusions of the ALJ" (id. at 3).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (Docket Entry 24 at 5-24.)

## 1. Step Three Listings Determination

In Plaintiff's first issue on review, he contends that his "conditions, including but not limited to [o]steoarthritis, [PTSD], [GAD], [u]nspecified [d]epressive [d]isorder and ongoing symptoms of chronic pain, agitation, depressed mood, sleep disturbance/nightmares, hypervigilance and flashbacks of traumatic events, all of which are supported by the medical evidence, have resulted in marked to extreme limitation that prohibits him from maintaining gainful activity." (Docket Entry 16 at 2 (emphasis added) (internal citation omitted).)[6] Although Plaintiff does not

---

[6] As the Commissioner notes, via Plaintiff's first issue on review, he "appears to argue that the ALJ erred in finding that [Plaintiff] did not meet the requirements of a [L]isting." (Docket Entry 24 at 7.) Moreover, Plaintiff raised additional arguments addressed to the ALJ's findings at step three of the

specify which marked to extreme limitations "prohibit[] him from maintaining gainful activity" (id.), he likely intended to argue that the mental RFC opinions offered by treating physician Dr. Gary L. Fink and treating psychologist Dr. William Scott Craig, which assigned marked and extreme limitations to Plaintiff's ability to perform many work-related mental functions (see Tr. 554-57, 558-61), established that he met one of the mental Listings.[7]  However, as discussed in more detail in connection with Plaintiff's second assignment of error, the ALJ did not err in discounting the opinions of Drs. Fink and Craig (see Tr. 29).  Thus, the marked and extreme limitations offered by those doctors do not, in and of themselves, establish that Plaintiff met or equaled any of the mental Listings.  Plaintiff offers additional reasons, however, why the ALJ's listing analysis amounts to legal error (see Docket Entry

---

SEP in his third issue on review.  (See Docket Entry 16 at 3-5 (arguing that the ALJ improperly relied on Plaintiff's ability to shop, care for his son, respect authority, socialize, use a computer, and maintain a driver's license to justify the ALJ's finding that Plaintiff's impairments did not meet or equal any of the Listings (citing Tr. 23, 24, 27, 28)); see also Docket Entry 24 at 10-11 (noting that "Plaintiff provides additional details (some of which were not provided to the ALJ) in asserting that his activities were limited in extent, and thus caused marked or extreme limitations" (citing Docket Entry 16 at 3-5)).)  Thus, this Recommendation will address all of Plaintiff's arguments concerning the ALJ's step three findings together.

[7] "The [L]istings set out at 20 CFR [P]t. 404, [S]ubpt. P, App['x] 1, are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 529-30 (1990) (internal footnote and parentheticals omitted).  "In order to satisfy a listing and qualify for benefits, a person must meet all of the medical criteria in a particular [L]isting." Bennett, 917 F.2d at 160 (citing Zebley, 493 U.S. at 530, and 20 C.F.R. § 404.1526(a)); see also Zebley, 493 U.S. at 530 ("An impairment that manifests only some of th[e] criteria [in a Listing], no matter how severely, does not qualify.").

10

16 at 3-5 (citing Tr. 23, 24, 27, 28)) which, for the reasons discussed below, do not entitle Plaintiff to relief.

Effective on January 17, 2017, the Commissioner made substantial revisions to the criteria for evaluating mental disorders in the Listing of Impairments. See https://www.federalregister.gov/documents/2016/09/26/2016-22908/revised-medical-criteria-for-evaluating-mental-disorders (last visited Oct. 29, 2019). As relevant to this case,[8] to meet the paragraph B criteria of revised Listings 12.04 ("Depressive, bipolar, and related disorders"), 12.05 ("Intellectual disorder"), 12.06 ("Anxiety and obsessive-compulsive disorders"), or 12.15 ("Trauma- and stressor-related disorders"), a claimant must show "[e]xtreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

1. Understand, remember, or apply information[;]

2. Interact with others[;]

3. Concentrate, persist, or maintain pace[; and]

4. Adapt or manage oneself.

---

[8] The ALJ apparently assumed, without explicitly finding, that Plaintiff's mental impairments satisfied the paragraph A criteria of Listings 12.04, 12.05, 12.06, and 12.15 (see Tr. 23-24), and Plaintiff did not raise any arguments directed at the ALJ's findings with respect to the paragraph C criteria (see Docket Entries 16, 26).

20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.04B, 12.05B, 12.06B, 12.15B (internal citations omitted) (emphasis added).[8]

The ALJ provided the following analysis of the paragraph B criteria:

> In understanding, remembering, or applying information, [Plaintiff] had a moderate limitation. In his Function Report, [Plaintiff] wrote his conditions affect his memory. However, the psychological consultative examiner noted that [Plaintiff] displayed an adequate ability to recall information regarding his overall history and his ability to understand, retain, and follow instructions was within normal limits. Additionally, [Plaintiff] testified he met his girlfriend online, he maintained a driver's license and drove himself to medical appointments and the store, he shopped, he was the primary care-giver for his son, and he had no problem with finances and was able to count change, pay bills, and manage a bank account.
>
> In interacting with others, [Plaintiff] had a moderate limitation. [Plaintiff] wrote in his Function Report that he avoids people. However, [Plaintiff] also wrote that is he able to care for his son, can shop in stores, and is able to get along with authority figures. Additionally, [Plaintiff] testified he lives with his fiancé[e].
>
> With regard to concentrating, persisting, or maintaining pace, [Plaintiff] had a moderate limitation. In his Function Report, [Plaintiff] wrote he has difficulties completing tasks and concentrating. After examining [Plaintiff], the psychological consultative examiner concluded he could concentrate long enough to perform simple, repetitive tasks. Again, [Plaintiff] was able to use a computer, he maintained a driver's license and drove himself to medical appointments and the store, he shopped, he was the primary care-giver for his son, and

---

[8] The ALJ's inclusion of Listing 12.05 for "Intellectual disorders" in his analysis (see Tr. 23) appears to constitute a typographical error, as the Plaintiff did not allege (see Tr. 264), and the record fails to reflect, an intellectual disability.

he had no problem with finances and was able to count
change, pay bills, and manage a bank account.

As for adapting or managing oneself, [Plaintiff] had
experienced a mild limitation. [Plaintiff] wrote in his
Function Report his appetite is affected by his symptoms
of depression and post-traumatic stress disorder.
However, he also wrote he could care for his son, prepare
simple meals, perform some housework, drive, go shopping,
and manage his own money.

(Tr. 23-24 (internal citations omitted).) Plaintiff maintains

that, in the above-quoted analysis, the ALJ failed to acknowledge

significant limitations on Plaintiff's ability to shop, care for

his son, respect authority, socialize, use a computer and maintain

a driver's license. (See Docket Entry 16 at 3-5 (citing Tr. 23,

24, 27, 28); see also Docket Entry 26 at 2 (arguing that "the

infrequency along with careful planning and execution of these

activities, in a concerted effort to avoid interactions with

others, is in direct contradiction to the ALJ's findings").)

More particularly, concerning his ability to shop, Plaintiff

notes that he "d[id] so infrequently (no more than twice per month)

at a store in a small town that is not close to his home during

off-peak hours to limit interaction and overwhelming surroundings"

and that "there ha[d] been times when [he] ha[d] been unable to

complete a shopping trip . . . when he became nervous, agitated or

hostile when surrounded by people." (Id. at 3.) As relates to

his son, Plaintiff contends that "the majority of necessary

supplies such as clothing[ and] school supplies . . . [we]re

purchased online and delivered," that Plaintiff's son rode a school bus, that Plaintiff interacted with teachers "primarily via email," and that "Plaintiff d[id] not attend parent-teacher conferences, back to school night or other school functions or activities." (Id.)  Regarding his respect for authority and ability to socialize, Plaintiff maintains that "he has had no interaction with authority figures since early 2011," as well as that "a gathering with former coworkers [referenced by the ALJ] was a 2 hour dinner visit with a few former coworkers . . . in [] Plaintiff's home, on [] Plaintiff's terms[, ] was finally scheduled after a long period of 'working up his nerve' to actually do it[, and ] was a one-time activity that was not repeated," and that "[h]e declines all invitations to other people's homes and public restaurants." (Id. at 4.)  With respect to Plaintiff's maintenance of a driver's license, Plaintiff emphasizes that he "has not renewed his driver's license[ or] visited a DMV office . . . since [his disability] onset date."  (Id. at 4-5.)  Furthermore, although Plaintiff acknowledges he "met his fiancée online and lives with [her]," he asserts that he "was not able to have a phone conversation [with her] until more than a month after beginning conversation online and did not meet [her] in person for several weeks after that," as well as that "there are frequent periods of distance and minimal communication" between Plaintiff and his fiancée.  (Id. at 5.)

Plaintiff's arguments fail because, in making the step three determination, the ALJ did not find that Plaintiff had unlimited or unqualified ability to engage in the activities in question. In that regard, the ALJ expressly acknowledged Plaintiff's statements that his mental "conditions affect his memory" (Tr. 23), that "he avoids people" (id.), that "he has difficulties completing tasks and concentrating" (id.), and that "his appetite is affected by his symptoms of depression and [PTSD]" (Tr. 24). Moreover, the ALJ assigned _moderate_ limitations to Plaintiff's abilities to understand, remember, and apply information, interact with others, and concentrate, persist, or maintain pace (see Tr. 23), which meant that Plaintiff's "functioning in th[ose] area[s] independently, appropriately, effectively, and on a sustained basis [wa]s _fair_," 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00F.2.c (emphasis added), and _mild_ limitation to Plaintiff's ability to adapt and manage himself (see Tr. 24), which indicated that Plaintiff's "functioning in th[at] area independently, appropriately, effectively, and on a sustained basis [wa]s slightly limited," 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00F.2.b. Moreover, as the Commissioner notes, Plaintiff did not provide to the ALJ, either in his testimony or on his Disability Reports and Function Report, many of the limitations and qualifications Plaintiff now places on his ability to engage in the activities at issue. (Compare Tr. 53-62, 72-74, 76-78, 80, 263-71, 280-87, 296-

303, 313-20, <u>with</u> Docket Entry 16 at 3-5.)  Plaintiff simply cannot fault the ALJ for failing to acknowledge information that Plaintiff did not present to the ALJ.

In short, Plaintiff's first issue on review does not entitle him to reversal or remand.

## 2. Opinion Evidence

Plaintiff next maintains that "[p]roper weight was not assigned to the [opinion] evidence." (Docket Entry 16 at 2 (bold font omitted).)  More specifically, Plaintiff faults the ALJ for "assign[ing] little or no weight to the [RFC] Assessments and other supporting documentation submitted by [Dr. Fink], [] Plaintiff's primary physician for 20+ years, and [Dr. Craig], Plaintiff's mental health provider for the last nine (9) months of [] Plaintiff's insured period and beyond." (<u>Id.</u> (citing Tr. 28-29) (referencing Tr. 543-61).)  According to Plaintiff, "[t]he only medical evidence that [the ALJ] assigned significant weight was the opinion of psychological consultative examiner Alexander Lopez, M.S., who spent less than ten (10) minutes with [] Plaintiff in only one (1) visit." (<u>Id.</u> at 2-3 (referencing Tr. 27-28, 499-504).)  Plaintiff contends that the "evidence submitted by [Drs.] Fink and Craig, after a much greater treatment period, establishes a severe level of impairment." (<u>Id.</u> at 3.)  Those arguments fall short.

16

The treating source rule generally requires an ALJ to give controlling weight to the opinion of a treating source regarding the nature and severity of a claimant's impairment. 20 C.F.R. § 404.1527(c)(2) ("[T]reating sources . . . provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."). The rule also recognizes, however, that not all treating sources or treating source opinions merit the same deference. The nature and extent of each treatment relationship appreciably tempers the weight an ALJ affords an opinion. See 20 C.F.R. § 404.1527(c)(2)(ii). Moreover, as subsections (2) through (4) of the rule detail, a treating source's opinion, like all medical opinions, deserves deference only if well-supported by medical signs and laboratory findings and consistent with the other substantial evidence of record. See 20 C.F.R. § 404.1527(c)(2)-(4). "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590 (emphasis added). Finally, statements from medical sources (and even treating sources) that a claimant qualifies as disabled or cannot work do not constitute "medical opinions as described in [§ 404.1527(a)(1)], but are,

instead, opinions on issues reserved for the Commissioner" and do not warrant controlling weight. 20 C.F.R. § 404.1527(d).[9]

Dr. Fink completed a preprinted form entitled "Mental Residual Functional Capacity Assessment" on December 13, 2017 (Tr. 558-61), on which he diagnosed Plaintiff with PTSD, rated his Global Assessment of Functioning ("GAF") score as 57, and assessed his prognosis as "[f]air" (Tr. 558).[9] Dr. Fink assigned "marked" limitation to Plaintiff's "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances" (Tr. 559), "ability to work in coordination with or proximity to others without being distracted by them" (Tr. 560), "ability to interact appropriately with the general public" (id.), "ability to accept instructions and respond appropriately to criticism from supervisors" (id.), "ability to respond appropriately to changes in the work setting" (id.), and "ability

---

[9] For claims filed on or after March 27, 2017, the Commissioner has significantly amended the regulations governing opinion evidence. The new regulations provide that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c. As Plaintiff filed his claims prior to March 27, 2017 (see Tr. 19), this Recommendation has analyzed Plaintiff's claims pursuant to the treating physician rule set out above.

[9] The GAF is a numeric scale from 0 to 100 representing a clinician's judgment of an individual's social, occupational and school functioning "on a hypothetical continuum of mental health-illness." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text rev. 2000) ("DSM-IV-R"). A GAF of 51 to 60 reflects "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) . . . OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)." Id. (bold font omitted). A new edition of the leading treatise discontinued use of the GAF. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013).

to tolerate normal amounts of stress" (Tr. 561).  Dr. Fink further opined that Plaintiff would have "extreme" limitation in his "ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of and length of rest periods" (Tr. 560), and "ability to travel in unfamiliar places or use public transportation" (Tr. 561).  Dr. Fink believed that Plaintiff remained "compliant with treatment" (Tr. 559), opined that Plaintiff's complaints did not amount to malingering (Tr. 558), and predicted that Plaintiff's mental impairments would cause him to miss work "3 days per month" (Tr. 561).  Dr. Fink concluded that Plaintiff "[wa]s unable to work [a] full or parttime job due to PTSD and due to his chronic pain."  (<u>Id.</u>)[10]

On December 7, 2017, Dr. Craig filled out a preprinted form entitled "Mental Impairment Questionnaire" (Tr. 549-53), and diagnosed Plaintiff with PTSD, GAD, and depressive disorder with a GAF score of 55 (Tr. 549).  Dr. Craig checked boxes which indicated that Plaintiff's symptoms included "[s]leep disturbance,"

_____

[10] Although Plaintiff faulted the ALJ for "assign[ing] little or no weight to [<u>RFC] Assessments and other supporting documentation</u> submitted by [Dr. Fink]" (Docket Entry 16 at 2 (emphasis added)), Plaintiff's remaining argument focused on reasons why the ALJ should not have given greater weight to the moderate <u>mental</u> limitations offered by consultative psychological examiner Lopez and did not discuss Dr. Fink's physical limitations (<u>see id.</u> at 2-3).  Accordingly, the undersigned will not discuss the opinions on the unsigned and undated form (attributed to Dr. Fink and assigned a date of "12/01/2017" in the index of the administrative transcript) entitled "Residual Functional Capacity Form" (Tr. 543-48).

"[p]ersonality change," "[m]ood disturbance," "[e]motional lability," "[a]nhedonia or pervasive loss of interests," "[p]aranoia or inappropriate suspiciousness," "[f]eelings of guilt or worthlessness," "[d]ifficulty thinking or concentrating," "[s]ocial withdrawal or isolation," "[i]ntrusive recollections of a traumatic experience," "[g]eneralized persistent anxiety," and "[h]ostility and irritability." (Tr. 550.) Dr. Craig also listed "[f]lashbacks, nightmares, hypervigilance, . . . ruminations, . . . [and] variable appetite" as additional symptoms suffered by Plaintiff. (Id.) Dr. Craig felt that Plaintiff's complaints did not constitute malingering (see Tr. 551), estimated that Plaintiff's impairments would cause him to miss more than three days of work per month (see Tr. 552), and opined that Plaintiff remained "clearly disabled from any and all work settings based on severity of PTSD symptoms, anxiety, depression, and chronic pain" (Tr. 552).

On that same day, Dr. Craig also completed a "Mental Residual Functional Capacity Assessment" (Tr. 554-57), on which he assigned "marked" limitation to Plaintiff's "ability to make simple work-related decisions" (Tr. 556) and "ability to accept instructions and respond appropriately to criticism from supervisors" (id.) and "extreme" limitation to his "ability to work in coordination with or proximity to others without being distracted by them" (id.), "ability to complete a normal workday and workweek without

20

interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of and length of rest periods" (id.), "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes" (id.), "ability to respond appropriately to changes in the work setting" (id.), "ability to be aware of normal hazards and take appropriate precautions" (Tr. 557), "ability to travel in unfamiliar places and use public transportation" (id.), and "ability to tolerate normal levels of stress" (id.).

The ALJ evaluated and weighed the mental opinions of Drs. Fink and Craig as follows:

> After carefully reviewing the record as a whole, [the ALJ] assign[s] little weight to the December 7, 2017, Mental Impairment Questionnaire and Mental Residual Functional Capacity Assessment provided by [Plaintiff's] treating psychologist, [Dr. Craig]. . . . Dr. Craig's conclusions are inconsistent with [Plaintiff's] reported activities of daily living and [Dr. Craig's] own treatment notes showing [Plaintiff] to have an intact memory, insight, and judgment. Additionally, Dr. Craig's statement that [Plaintiff] is "clearly disabled" is not a medical opinion, but rather an administrative finding dispositive of a case. These issues are reserved to the Commissioner, and as such are not entitled to any special significant weight. At the [SSA], we take into account factors such as age, education, work history, and functioning into determinations of disability and there is little indication that this source did the same.
>
> After carefully reviewing the record as a whole, [the ALJ] assign[s] little weight to the December 13, 2017, Mental Residual Functional Capacity Assessment provided by [Plaintiff's] treating physician, [Dr. Fink]. . . . Dr. Fink's statement that [Plaintiff] cannot work full or part time is not a medical opinion, but rather an administrative finding dispositive of a case. These

> issues are reserved to the Commissioner, and as such are
> not entitled to any special significant weight. At the
> [SSA], we take into account factors such as age,
> education, work history, and functioning into
> determinations of disability and there is little
> indication that this source did the same.

(Tr. 29 (internal citations omitted).) The ALJ did not err in
discounting the opinions of Drs. Fink and Craig.

As concerns Dr. Craig, the record supports the ALJ's finding
that Dr. Craig's substantial mental limitations conflicted with
Plaintiff's activities of daily living. (See id.) As recognized
by the ALJ, Plaintiff's abilities to care for his son (including
assisting his son with homework, preparing meals for him,
purchasing needed supplies in stores and online, and communicating
with his son's teachers and school administrators), maintain a
driver's license, drive himself to medical appointments, have a
long-term relationship with his live-in fiancée, and handle his
finances (see Tr. 77, 281, 283, 288) contradict Dr. Craig's
"marked" and "extreme" limitations on Plaintiff's capability to
handle matters such as making "simple work-related decisions" (Tr.
556), getting along with others "without being distracted by them"
or "exhibiting behavioral extremes" (Tr. 556), and remaining "aware
of normal hazards and tak[ing] appropriate precautions" (Tr. 557).

The evidence of record also supports the ALJ's finding that
Dr. Craig's opinions conflict with his own treatment notes. (See
Tr. 29.) Dr. Craig's mental status examinations of Plaintiff,

22

without exception, reflected entirely normal attention, concentration, thought, speech, memory, cognition, insight, and judgment. (See Tr. 521, 524, 526, 533-34, 965-66, 967-68, 969-70, 971-72, 973-74, 975-76, 977-78, 979-80, 981-82, 983-84, 985-86, 987-88, 989-90.) As regards Dr. Craig's opinion that Plaintiff "[wa]s clearly disabled from any and all work settings" (Tr. 552), the ALJ certainly did not err by invoking the Commissioner's long-time rule that such opinions constitute matters dispositive of a case and carry no special significance (see Tr. 29; see also 20 C.F.R. § 404.1527(d)).

With respect to Dr. Fink, the ALJ correctly observed that Dr. Fink's opinion that Plaintiff "[wa]s unable to work [a] full or parttime job" (Tr. 561) constituted a matter reserved to the Commissioner and warranted no "special significant weight" (Tr. 29; see also 20 C.F.R. § 404.1527(d)). However, unlike the ALJ's analysis of Dr. Craig's opinions, the ALJ did not specifically find that Dr. Fink's mental opinions conflicted with Plaintiff's reported daily activities, with the treatment notes of Drs. Fink and/or Craig, or with other evidence in the record. (See Tr. 29.) Although the ALJ's analysis of Dr. Fink's mental opinions thus lacked thoroughness, no basis for remand on this grounds exists. Because the ALJ provided sound reasons for discounting Dr. Craig's marked and extreme limitations (see id.), those same reasons would apply to discount Dr. Fink's very similar marked and extreme

limitations.  See Morgan v. Barnhart, 142 F. App'x 716, 723 (4th Cir. 2005) (deeming any error by ALJ in failing to credit treating physician's opinion harmless where ALJ adopted another opinion that did not "materially contradict" treating physician's opinion (citing Ngarurih v. Ashcroft, 371 F.3d 182, 190 n.8 (4th Cir. 2004))); Yuengal v. Astrue, No. 4:10-CV-42-FL, 2010 WL 5589102, at *9 (E.D.N.C. Dec. 17, 2010) (unpublished) (finding harmless error and deeming ALJ's reasons for discounting one treating physician's opinion "equally applicable" to opinion of another treating physician not properly addressed by ALJ), recommendation adopted, 2011 WL 147297 (E.D.N.C. Jan. 18, 2011) (unpublished), aff'd, 441 F. App'x 168 (4th Cir. 2011).

In sum, Plaintiff's second assignment of error fails as a matter of law.

### 3. Subjective Symptom Reporting

Plaintiff next faults the ALJ for finding Plaintiff's statements "not consistent with medical evidence and referenc[ing] one office visit with [Dr.] Craig where [] Plaintiff 'did not report symptoms of depression.'" (Docket Entry 16 at 5 (quoting Tr. 27).)  Plaintiff points out that "office notes submitted by [Dr.] Craig consistently report[ed] a diagnosis of [d]epressive [d]isorder and symptoms of [d]epressed [m]ood, PTSD, [a]nxiety, [r]uminations, [i]rritability, [a]gitation, [c]oncentration

[d]ifficulty and other related symptoms throughout." (Id.) That contention lacks merit.

Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, at *5 (Oct. 25, 2017) ("SSR 16-3p") (consistent with the Commissioner's regulations) adopts a two-part test for evaluating a claimant's statements about symptoms. See SSR 16-3p, 2017 WL 5180304, at *3; see also 20 C.F.R. § 404.1529.[11] First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain." SSR 16-3p, 2017 WL 5180304, at *3. A claimant must provide "objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce [the] alleged symptoms." Id. Objective medical evidence consists of medical signs ("anatomical, physiological, or psychological abnormalities established by

_____

[11] Applicable to ALJ decisions on or after March 28, 2016, the Social Security Administration superceded Social Security Ruling 96-7p, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims, 1996 WL 374186 (July 2, 1996) ("SSR 96-7p"), with SSR 16-3p. The new ruling "eliminat[es] the use of the term 'credibility' from . . . sub-regulatory policy, as [the] regulations do not use this term." Id. at *1. The ruling "clarif[ies] that subjective symptom evaluation is not an examination of the individual's character," id., and "offer[s] additional guidance to [ALJs] on regulatory implementation problems that have been identified since [the publishing of] SSR 96-7p," id. at *1 n.1. The ALJ's decision in this case postdates the effective date of SSR 16-3p (see Tr. 32) and, thus, this Recommendation will apply SSR 16-3p to Plaintiff's argument regarding the ALJ's subjective symptom evaluation.

medically acceptable clinical diagnostic techniques") and laboratory findings "shown by the use of medically acceptable laboratory diagnostic techniques." Id.

Upon satisfaction of part one by the claimant, the analysis proceeds to part two, which requires an assessment of the intensity and persistence of the claimant's symptoms, as well as the extent to which those symptoms affect his or her ability to work. See id. at *4. In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." Id. Where relevant, the ALJ will also consider the following factors in assessing the extent of the claimant's symptoms at part two:

1. Daily activities;

2. The location, duration, frequency, and intensity of pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g.,

>     lying flat on his or her back, standing for 15 to 20
>     minutes every hour, or sleeping on a board); and
>
>     7. Any other factors concerning an individual's
>     functional limitations and restrictions due to pain or
>     other symptoms.

Id. at *7-8. The ALJ cannot "disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." Id. at *5 (emphasis added).

In this case, the ALJ found for Plaintiff on part one of the inquiry, but ruled, in connection with part two, that his "statements concerning the intensity, persistence and limiting effects of [his] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the ALJ's] decision." (Tr. 26; see also Tr. 27.) Later in the decision, the ALJ noted as follows with regard to Plaintiff's mental health treatment:

>     Regarding [Plaintiff's] mental health, in early 2011,
>     following an incident at work, he sought mental health
>     treatment, was diagnosed with [PTSD], and was prescribed
>     psychotropic medications. He reported symptoms of
>     depression and [PTSD] in March 2016 to a new provider.
>     At that time, he was diagnosed with [PTSD] and depressive
>     disorder with a [GAF] score of 54. In late March 2016,
>     he was also diagnosed with [GAD]. [Plaintiff] attended
>     therapy sessions on a bi-weekly basis into at least May
>     2016. During a June 2017 therapy session, he reported
>     his [PTSD] symptoms ha[d] been relatively stable, he
>     ha[d] been socializing with neighbors, and he ha[d]
>     gotten together with some old friends from the police
>     force. In September 2017, [Plaintiff] reported nightly

> insomnia and nightmares. <u>During a September 2017 office visit with his physician, [Plaintiff] did not report any symptoms of depression</u>. [Plaintiff] reported increased symptoms of [PTSD] in December 2017 and ha[d] become more socially withdrawn.
>
> . . .
>
> During [Plaintiff's] therapy sessions, his memory, judgment, and insight have been noted to be intact and his thought process has been noted to be logical and goal directed.

(Tr. 27 (citing Tr. 520, 521, 522, 524, 526, 534, 570, 991, 995, 999, 1000, 1003, 1007, 1011, 1015, 1016, 1019, 1023, 1024) (internal citations omitted) (emphasis added).)

As the above-quoted discussion makes clear, the ALJ observed that Plaintiff "did not report any symptoms of depression" (<u>id.</u>) during a September 2017 office visit with Dr. Fink (<u>see</u> Tr. 570 (reflecting that Plaintiff denied experiencing "[l]ittle interest or pleasure in doing things" or "[f]eeling down, depressed, or hopeless" in the previous two weeks)) as part of his overall discussion of Plaintiff's mental health treatment history. In other words, contrary to Plaintiff's argument, the ALJ did not find Plaintiff's statements about the intensity of his symptoms inconsistent with the record evidence <u>solely</u> on the basis of the absence of depression complaints during that September 2017 office visit. Moreover, the ALJ clearly acknowledged that Dr. Craig diagnosed Plaintiff with depressive disorder, PTSD, and GAD (<u>see</u> Tr. 27, 29), as well as Dr. Craig's opinion that Plaintiff's

symptoms included flashbacks, nightmares, hypervigilance, irritability, and difficulty concentrating (see Tr. 29). Furthermore, the ALJ also discussed the gap in Plaintiff's mental health treatment from 2011 to March 2016, Dr. Craig's assignment of a GAF score of 54 (reflecting only moderate symptoms), Plaintiff's characterization of his PTSD symptoms as "relatively stable," his reports of "socializing with neighbors" and "with some old friends from the police force," and Dr. Craig's mental status examinations of Plaintiff, which consistently reflected normal memory, judgment, insight, and thought process. (Tr. 27.) That analysis suffices.

Accordingly, Plaintiff has not shown that the ALJ erred in evaluating Plaintiff's subjective symptom reporting.

### 4. Vocational Evidence

Next, Plaintiff challenges the ALJ's "conclu[sion] that [] Plaintiff [wa]s capable of making a successful adjustment to other work." (Docket Entry 16 at 5 (citing Tr. 32).) According to Plaintiff, the ALJ's conclusion in that regard "is not consistent with testimony from [the VE], whom the [ALJ] subpoenaed, who based on a scenario posed by the ALJ, determined [] Plaintiff would 'be absent 2 or more days per month which is generally not tolerated in any industry.'" (Id. (quoting Tr. 376).) Plaintiff's challenge falls short.

Here, the VE's written response to the post-hearing interrogatories reflects her opinion that absences of two days or

more per month generally preclude all jobs in the national economy. (See Tr. 375, 376.) However, the VE provided that answer in response to a hypothetical question posed by Plaintiff's counsel containing restrictions, including absences of two or more days per month, that the ALJ did not ultimately adopt. (Compare Tr. 25, with Tr. 374-75.) The ALJ labored under no obligation to adopt limitations in hypothetical questions posed by Plaintiff's counsel (or even by the ALJ himself) that the ALJ ultimately found unsupported by the record. See Hammond v. Apfel, 5 F. App'x 101, 105 (4th Cir. 2001) (holding "that the ALJ did not err in disregarding the VE's response to counsel's hypothetical" where, "[b]ased on an evaluation of the evidence, the ALJ was free to accept or reject restrictive hypothetical questions"); Davis v. Apfel, No. 97-1719, 162 F.3d 1154 (table), 1998 WL 559728, at *2 (4th Cir. 1998) (unpublished) (noting that, "[b]y presenting a hypothetical, the ALJ was not making findings of fact"); Woodlief v. Berryhill, No. 5:16CV191FL, 2017 WL 9478528, at *5 (E.D.N.C. Aug. 4, 2017) (unpublished) ("[A]n ALJ is permitted to ask a VE multiple hypotheticals, even if they are contradictory, as such hypothetical questions are not findings of fact, and it is entirely permissible for the ALJ to determine after the hearing which hypothetical is supported by the record."), recommendation adopted, 2017 WL 4164076 (E.D.N.C. Sept. 20, 2017) (unpublished). Moreover, as discussed above, the ALJ did not err in discounting the opinions

of Drs. Fink and Craig that Plaintiff's mental impairments would cause him to miss 3 or more days per month.[12]

Therefore, Plaintiff has not shown that the ALJ erroneously relied on the VE's responses to the dispositive hypothetical question.

## 5. New Evidence

Lastly, Plaintiff asserts that, "[f]ollowing receipt of the ALJ's decision, [Dr. Craig] provided additional documentation ["2018 Letter Opinion"] which was provided to [Plaintiff's hearing-level attorney] to be submitted with the [request for review to the Appeals Council]," but that, "not only did [his hearing-level attorney] fail to file a brief explaining reasons for appeal or submit [the 2018 Letter Opinion], [the attorney] subsequently dropped [] Plaintiff as a client without notice or explanation." (Docket Entry 16 at 1 (referencing Docket Entry 16-1).) Plaintiff points out that the Appeals Council "made the decision to deny

_____

[12] Plaintiff maintains in his reply brief that "job descriptions" for the occupations cited by the VE and relied upon by the ALJ at step five of the SEP reflect that those occupations "require the ability to stoop, kneel, bend, twist, lift, reach, and/or stand consistently for an 8 hour shift," and also contain "production requirements, which [] contradicts the ALJ's assessment of [] Plaintiff's capabilities." (Docket Entry 26 at 3.) As an initial matter, the Court need not consider arguments raised for the first time in a reply brief. See M.D.N.C. LR7.3(h) ("A reply is limited to discussion of matters newly raised in the response."). Further, Plaintiff fails to identify the "job descriptions" upon which he relies. (See Docket Entry 26 at 3.) Finally, the Dictionary of Occupational Titles ("DOT") reflects that the jobs of Marker, Garment Sorter, and Garment Folder conform to the ALJ's RFC (see Tr. 25) and dispositive hypothetical question (see Tr. 370). See DOT, No. 209.587-034 (Marker), 1991 WL 671802 (G.P.O. 4th ed. rev. 1991); DOT, No. 222.687-014 (Garment Sorter), 1991 WL 672131; DOT, No. 583.685-042 (Folding Machine Operator), 1991 WL 684324).

[review] without the benefit of [] Plaintiff's brief or [the 2018 Letter Opinion], which was promised to be delivered by [Plaintiff's hearing-level attorney] via letter dated August 3, 2018." (Id. at 2.) Further, Plaintiff notes that the Commissioner "oppose[d] [] Plaintiff's submission of [the 2018 Letter Opinion] based on timeliness requirements," but notes that "the very Motion by which the [Commissioner] oppose[d] said submission was allowed only as a result of being granted an extension [of time] following [the Commissioner's] failure to file a timely response." (Docket Entry 26 at 3.) According to Plaintiff, "[b]ased on the Court's willingness to allow an extension [of time] to ensure the inclusion of all relevant information, [] Plaintiff feels it is only right to allow [the 2018 Letter Opinion] as well." (Id.) Plaintiff's assertions miss the mark.

Dr. Craig signed the 2018 Letter Opinion (which he addressed to the Appeals Council) on June 12, 2018, and reported that he provided "psychological counseling services" to Plaintiff during the two-year period from March 9, 2016, to March 9, 2018. (Docket Entry 16-1 at 1.) Dr. Craig further indicated that Plaintiff's diagnoses included PTSD, GAD, and unspecified depressive disorder, that "[h]e tracked PTSD symptoms via The PTSD Coach App, and [that] he worked on The PTSD Workbook in counseling." (Id.) Dr. Craig opined that, ever since Plaintiff suffered exposure to traumatic events while a police officer, "he has experienced recurrent,

involuntary, and intrusive distressing memories of the traumatic events[,] . . . recurrent flashbacks and nightmares[,] . . . [and] marked physiological reactions to internal and/or external cues that symbolize or resemble an aspect of the traumatic events." (Id.) According to Dr. Craig, Plaintiff "has a persistent negative emotional state[, ] a diminished interest in significant activities . . .[,] some feelings of detachment from others[,] . . . irritability, hypervigilance, exaggerated startle response, sleep disturbance, [] variable concentration[,] . . . agitation/motor tension, apprehensive expectation, fear, distrust, anxiety, depressed mood, [] ruminations, obsessive traits, and escape/avoidance tendencies." (Id.) Dr. Craig concluded that "[t]he severity of th[o]se ongoing symptoms limit[ed] [Plaintiff's] ability to consistently and effectively perform basic work activities, interact with others, or adapt to stressful situations." (Id. at 2.)

"[A federal district court] may at any time order additional evidence to be taken before the Commissioner [ ], but only upon a showing that there is <u>new</u> evidence which is <u>material</u> and that there is <u>good cause</u> for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g) (emphasis added). "Evidence is new within the meaning of [the Commissioner's regulations] if it is not duplicative or cumulative." <u>Wilkins v. Secretary of Dep't of Health & Human Servs.</u>, 953 F.2d 93, 95-96

(4th Cir. 1991).  "Evidence . . . is material if there is 'a reasonable probability that the new evidence would have changed the outcome.'"  Meyer v. Astrue, 662 F.3d 700, 705 (4th Cir. 2011) (quoting Wilkins, 953 F.2d at 96).)

Even assuming, arguendo, that the failure of Plaintiff's hearing-level attorney to submit the 2018 Letter Opinion to the Appeals Council establishes "good cause," as the Commissioner argues (see Docket Entry 24 at 22-23), the 2018 Letter Opinion qualifies neither as new nor material.  The 2018 Letter Opinion does not meet the definition of "new," because its information and opinions merely duplicate the information in Dr. Craig's treatment notes of record and Dr. Craig's opinions on the Mental Impairment Questionnaire and Mental Residual Functional Capacity Assessment (which, as discussed above, the ALJ did not err by discounting). (Compare Tr. 519-34, 549-57, 954-1026, with Docket Entry 16-1.) Furthermore, for that same reason, the 2018 Letter Opinion lacks materiality because, given the ALJ's well-founded decision to discount Dr. Craig's opinions of record, no reasonable probability exists that the 2018 Letter Opinion would have changed the outcome of Plaintiff's DIB claim.

Thus, the 2018 Letter Opinion does not warrant remand under sentence six of 42 U.S.C. § 405(g).

### III. CONCLUSION

Plaintiff has not established grounds for relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's motion for judgment (Docket Entry 16) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 23) be granted, and that judgment be entered dismissing this action.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

November 4, 2019